**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GREGORY CYPRIAN VANNESTE,

           Petitioner,                  Case No. 16-cv-13225
                                                Hon. Matthew F. Leitman

v.

TONY TRIERWEILER,

           Respondent.
_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF #1) AND (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner Gregory Cyprian VanNeste is a state prisoner in the custody of the Michigan Department of Corrections. On September 7, 2016, VanNeste, through counsel, filed a petition for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254. (*See* ECF #1.) In the petition, VanNeste challenges his state-court convictions for first-degree criminal sexual conduct ("CSC I"), Mich. Comp. Laws § 750.520b (sexual penetration, victim between the ages of 13 and 16 and member of the same household), kidnapping, Mich. Comp. Laws § 750.349, and two counts of second-degree criminal sexual conduct ("CSC II"), Mich. Comp. Laws § 750.520c (sexual contact, victim between the ages of 13 and 16 and a member of the same household). The state trial court sentenced VanNeste to concurrent prison

terms of 225 months to 30 years for the CSC I and kidnapping convictions and 10 to 15 years for the CSC II convictions.

The Court has reviewed VanNeste's claims and concludes that he is not entitled to federal habeas relief. Accordingly, the Court will **DENY** his petition. The Court will also decline to issue VanNeste a certificate of appealability.

# I

VanNeste was convicted of the above-described offenses following a jury trial in the St. Clair County Circuit Court. The Michigan Court of Appeals recited the relevant facts as follows:

> AJ, the victim, was 15 years old at the time of the incident. She lived with her mother and defendant, her mother's boyfriend, in defendant's home. Her sisters SJ and LV also lived in the home. On August 31, 2012, AJ was alone in the home. Defendant was to pick up AJ from his home and take her to her maternal grandfather's home. According to AJ, when defendant arrived, she spoke to him briefly in her upstairs bedroom. The two went to the home's main floor. Defendant suddenly grabbed AJ by the arm and forced her into his bedroom, where he sexually assaulted her for approximately three hours. He placed a revolver at AJ's head during the assault. Defendant wore condoms at various points during the assault, and completed his assault by ejaculating on AJ's stomach. Once he ended the assault, defendant forced AJ to shower and change the bed linens. Defendant then drove AJ to her grandfather's home. According to AJ, defendant stated "that he was scared to go to jail" during the drive. After defendant dropped AJ off and left the home, AJ told her grandfather that she had been raped. Police were called immediately, and AJ was taken to a local hospital.

Officer William Myles ("Myles") and another officer stopped defendant in his vehicle shortly thereafter. Upon searching defendant's vehicle, officers found a revolver in the glovebox. Defendant consented to a search of his home. Myles and Trooper Rick Sebring ("Sebring") searched the home. The home was covered in garbage and dog feces, and smelled strongly of urine; the basement was covered with wet, dirty clothes. There were no linens on defendant's bed, but blankets and linens were found in the clothes washer and dryer in the basement, along with girl's clothing and a pair of men's underwear. Defendant explained this by telling the officers that one of his dogs had urinated on the bed, AJ, and himself. However, Sebring found no odor of urine on the bed, and felt no dampness.

The medical examination of AJ found injuries consistent with forced vaginal penetration. Swabs were taken and sent for further analysis. These swabs tested positive for seminal fluid, and were sent for DNA analysis. The first DNA analysis found insufficient data to positively identify defendant as the source of the seminal fluid. However, the available data matched defendant's DNA profile. A second analysis, the Y–STR analysis, examined the Y-chromosome only. This analysis found a perfect match between the seminal fluid found and defendant's DNA profile. However, because this test only looks at the Y-chromosome, it cannot positively identify any particular individual as the source of the seminal fluid. Because the Y-chromosome is passed from father to son without alteration, all of defendant's male relatives would share this same chromosome.

Defendant was interviewed by Sebring. During the interview, defendant maintained that one of the dogs had urinated on the bed, himself, and AJ. He explained that he directed AJ to give him her clothes and to take a shower, which she did. He claimed that he did the same after AJ finished showering, and that he asked AJ to help remove the bed linens so they could be washed. He denied having

sex with AJ. Sebring told defendant that he found the story unbelievable, given the condition of the house, and considering that defendant's girlfriend was hospitalized. He asked defendant how it was possible that AJ would have semen on her stomach matching defendant's DNA. Defendant explained that he had sex with AJ's mother that morning or the day before in the bathroom. He explained that AJ's mother was menstruating at the time, and that he used a bath towel to clean up afterwards. Defendant stated that he hung the bath towel up in the bathroom afterwards, and that AJ could have used the towel after her shower. Sebring expressed his disbelief of defendant's story and ended the interview. Defendant was transported by car to jail. During this drive, defendant made a few spontaneous utterances, including expressing his love for AJ's mother and fear that "she would not love him no more for what he had did." Upon approaching the jail, defendant asked "what people would do, what people do in jail to people that commit crimes like this[.]"

Defendant testified that when he arrived at his home, three young men were running from the house. He claimed to have told Sebring about this during his interview, but that Sebring failed to mention it in the report. Defendant ran inside the home and found AJ lying on her bed with her pants partially removed. Defendant claimed he tried to talk to AJ about what happened, but that she would not talk to him, so he decided to let her mother handle the situation. He asked AJ to let the dogs out from the basement. She did so, and one of the dogs urinated on defendant's bed, on defendant, and on AJ. Defendant again explained that he and AJ started washing the affected clothing and bed linens, showered, and left for her grandfather's home.

Defendant explained that he always carried a revolver, and that the revolver had been in his glovebox the entire day. He denied having made incriminating statements during the drive to jail. He denied that the sexual assault occurred. He also explained that AJ had watched the movie, "The Crush," in which a daughter frames her mother's

4

boyfriend for sexual assault by obtaining his DNA. Defendant then explained that his family had a long history in the area, and that he "can't go anywhere without" seeing a relative. He claimed that two of the three young men he saw running from the home were related to him. He named one but could not remember the name of the other. However, the prosecutor called a rebuttal witness. This witness was employed with a local juvenile detention center. He testified that the individual named by defendant was being held at the juvenile detention center on the day of the assault.

*People v. VanNeste*, 2015 WL 447453, at ** 1-2 (Mich. Ct. App. Feb. 3, 2015).

VanNeste appealed his convictions to the Michigan Court of Appeals, and that court denied relief. *See id.* VanNeste then filed an application for leave to appeal in the Michigan Supreme Court, and that court denied leave. *See People v. VanNeste*, 868 N.W.2d 627 (Mich. 2015).

VanNeste filed his federal habeas petition in this Court on September 7, 2016. (*See* ECF #1.) He seeks relief on the following ground:

Did the trial judge violate due process by failing to disclose privileged information necessary to the defense, and for trial preparation, and by restricting and impairing defendant's constitutional rights to confrontation, to compulsory process, to testify, and to present a complete defense at trial?

(*Id.* at Pg. ID 4.)

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a federal court shall not grant habeas relief based upon a claim that was

adjudicated on the merits by a state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

VanNeste acknowledges that his claims are subject to review under AEDPA and that he must satisfy the standards for relief under AEDPA.[2] (*See* Pet., ECF #1 at Pg. ID 26-29.)

---

[2] Respondent urges this Court to deny VanNeste's claims on the ground that they are procedurally defaulted. Respondent argues that in the state courts, VanNeste's counsel raised only state-law arguments and did not argue that the state trial court violated VanNeste's *federal* constitutional right to present a defense. Procedural default is not a jurisdictional bar to review of a federal habeas petition on the merits. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). In addition, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. The Court believes that in light of the complexities of the procedural default issue, it would be easier to proceed to the merits of the claims. It does so below.

## III

### A

VanNeste argues that the state trial court denied him his constitutional right to present his complete defense – "that all the charges were fabricated [by the complainant, AJ] as part of a plan to separate him from [AJ] and her young sister's mother." (Pet., ECF #1 at Pg. ID 29.)  More specifically, VanNeste says that the trial court wrongly (1) failed to produce to him a Child Protective Services report that included evidence that AJ's sister, SJ, had threatened to falsely accuse him of rape, (2) failed to produce to him AJ's mental health reports, (3) held that he could not introduce into evidence SJ's threat to falsely accuse him of rape and limited his cross-examination of AJ with respect to her discussions with SJ regarding VanNeste, and (4) prohibited him from testifying that Child Protective Services frequently visited the home in which AJ lived in order to address false claims that had been made against him.  VanNeste insists that this evidence could have shown that AJ had falsely accused him of sexual assault.  The Court will examine each of these alleged errors in turn below.

### 1

Before turning to each of VanNeste's claims of error, the Court must first review the procedural history and background of his state court trials.  VanNeste was

initially tried in April of 2013. That trial resulted in a hung jury. VanNeste's second trial was held in June of 2013 and resulted in the convictions described above.

On October 9, 2012, prior to the first trial, VanNeste's trial counsel filed a motion under the Michigan Court Rules seeking the disclosure of privileged information pertaining to AJ, including reports from the Department of Human Services and/or Child Protective Services. The state trial court then agreed to conduct an *in camera* review of these materials. (*See* ECF #6-3.)

On December 19, 2012, the trial court issued a written opinion denying the disclosure of any documents to the defense. It held that "no information within those reports contain evidence that would be reasonably necessary or essential to the defense in this matter." On December 20, 2012, the trial court amended its order and required the production of an April 19, 2012, report "which relat[ed] to an event that caused [AJ] to be upset with [VanNeste]."[3]

At the beginning of VanNeste's second trial, his trial counsel moved for reconsideration of his earlier request for disclosure. In this motion, VanNeste's counsel specifically referenced a "Child Protective Services Report" that "had been

_____

[3] Neither VanNeste nor Respondent has provided this Court with copies of these orders from the state trial court. VanNeste references these orders in his petition, and Respondent has not dispute that these orders were issued or that the orders contained this wording. Accordingly, the Court accepts as true VanNeste's claim that these orders were issued. *See Cristini v. McKee,* 526 F.3d 888, 894, n. 1 (6th Cir. 2008).

furnished" to VanNeste during "an earlier parental rights trial." (ECF #6-9 at Pg. ID 842-43). Counsel had not seen the report but believed that it had relevant information to the defense. (*See id.*) The trial judge denied reconsideration and stated that he had "review[ed] a wide variety of documents" and "didn't see anything that [he] thought would be beneficial to the defense." (*Id.* at 844-45.) The court added, "I don't have any evidence of any false allegations or other items that I think would have been beneficial." (*Id.* at Pg. ID 845).

The next day, before AJ was to testify, VanNeste's counsel told the trial court that the prosecutor had informed him that AJ's sister, SJ, had also made allegations of sexual misconduct against VanNeste. Counsel did not know, and evidently was not informed, whether the allegations had been made before or after VanNeste's first trial, but he argued that the details and reports related to those allegations were important to the defense. The prosecutor acknowledged that SJ had made allegations against VanNeste and said that the allegations were still under investigation. (*See* ECF #6-10 at Pg. ID 858.) The prosecutor insisted that the allegations were not relevant to VanNeste's defense because they involved a "complete[ly] separate type of factual scenario" that "had nothing to do with this case." (*Id.*) VanNeste's counsel then advised the court that after he told VanNeste of the new investigation related to SJ, VanNeste recalled that his previous attorney had seen a Department of Human

Services report that contained evidence that SJ had previously considered falsely accusing VanNeste of rape. (*See id.* at Pg. ID 858-59.)

VanNeste's counsel then requested an *in-camera* review, asked for the disclosure of the records related to SJ, and moved to add SJ and any related witnesses to the defense witness list. (*See id.* at Pg. ID 859-64.) VanNeste's counsel argued that disclosure was "absolutely relevant to the case" because the records supported the theory that "there is some conspiracy … between these two siblings." (*Id.* at Pg. ID 860.) The prosecutor objected, painting counsel's request as "a fishing expedition to try to see if there's anything else there to paint a bad light on [AJ]." (*Id.* at Pg. ID 861). VanNeste's counsel suggested that a threat of a false sexual assault by one "closely connected with" AJ could show that AJ and SJ "conspired together," or came up with "a plan," and was "relevant because we are here to determine whether or not a false allegation was made." (*Id.* at Pg. ID 861-62.)

The trial court judge asked the prosecutor to provide him with the files from SJ's case, and the prosecutor did so. (*See id.* at Pg. ID 865-66.) Within about 30 minutes (*see id.* at 865, 884), the judge indicated that he had located the incident report referred to by VanNeste's counsel, shared it with counsel in chambers, and placed the following on the record:

> This is Children's Protective Services investigation report. It's dated September 1, 2012, which would be the date following this allegation. And it does talk about the allegations, but it gives on the second or third pages some

child welfare history of family trends. And they refer back to an item that was logged in on April 23, 2010. And it indicates the following: [SJ] was acting up and threatening both Rachel and Greg. K.H.H. has been contacted and currently she may have to be placed at Harbor Oaks. [SJ] has been threatening people, Greg, Alyssa, Michael and Lauren. [SJ] has been interviewed by Ms. Abraham who was asked if she has ever been sexually assaulted. She, [SJ] said no. Just recently [SJ] has stated that she wants to go to live with her father and wants to go live with him now. If she doesn't, she said she is going to say Greg sexually molested her. [SJ] has physically assaulted Lauren, has picked her up and threw her, has left bruises. [SJ] swears at both her mother and stepfather. [SJ] calls Rachel an ignorant bitch, tells Greg he's a fucking asshole son of a bitch, Rachel's a dumbass. Family is asking for help. We would like Leann Mallory (phonetic) to come and help again. Family would like to get structure to the home. Family would also like Carla LaGar (phonetic) counselor, to be involved in the family again. Has taken of no removal. I believe that's the reference that has been alluded to. And now I'll let the attorneys speak to that issue at this time or at this point.

(*Id.* at Pg. ID 885-86.)

The prosecutor continued to object to the admission of this evidence. She argued that because the incident occurred in 2010, it would cause "confusion of issues to the jury," and its prejudice would "greatly outweigh[] any kind of remotely possible relevant evidence to whether [AJ] is credible or not." (*Id.* at Pg. ID 886-87.) VanNeste's counsel again argued the threat of a false sexual assault by a member of the "same household" as AJ was "extremely relevant," would not confuse the jury, and was necessary to VanNeste's right to present a defense. (*Id.* at Pg. ID 888.)

11

The judge denied VanNeste's counsel's request to call SJ as a witness, or "any other individual who may have interviewed her," stating:

> It doesn't involve [AJ]. And it's two years prior to these allegations. And there is no indication anywhere that this was an idea that was placed in her mind by her sister. There is no indication anywhere in this voluminous record that she and her sister have discussed at in any point in time, that it's an idea that she got from her sister. I believe that whatever value it has it would be outweighed by the prejudice it would create in this case, and I'll not allow that information to be directly presented to the jury by way of testimony from [SJ] or any other individual that may have interviewed her."

(*Id.* at Pg. ID 888-89.)

The judge, however, stated that he would allow VanNeste's counsel to cross-examine AJ "as to were there any conversations she may have had with her sister about such topics," and he promised "full latitude in that area." (*Id.* at Pg. ID 889.)

## 2

VanNeste's counsel cross-examined AJ at length at VanNeste's second trial. First, VanNeste's counsel elicited the following testimony about AJ's hatred of VanNeste:

- AJ testified that she hated VanNeste, had told other people that she hated VanNeste, and had spoken about wanting to kill him. (*See id.* at Pg. ID 1002-04);

- AJ testified that she had written about her hatred for VanNeste in her diary and on house walls and talked about him being dead. She also admitted that she would draw and write that VanNeste was a "fag" and drew a picture of him burning. (*Id.* at Pg. ID 1002-03)

- AJ admitted to telling her counselors she didn't like VanNeste because he was dating her mom. AJ further admitted that she did not want her mother to be dating VanNeste and wanted her mother to be with AJ's biological father instead. (*See id.* at 1004-05);

- AJ testified that she felt like VanNeste treated her unfairly. (*See id.* at Pg. ID 997-98);

- AJ acknowledged that VanNeste set certain rules in the house, that she did not always follow these rules, and that she did not like being disciplined by VanNeste for violating these rules. (*See id.* at Pg. ID 999-1000); and

- AJ acknowledged that both VanNeste and AJ's mother sought out the Department of Human Services because of AJ's difficulties at home. (*See id.* at Pg. ID 1001.)

VanNeste's counsel also questioned AJ about her interactions with SJ, and whether she and SJ ever talked about AJ's hatred of VanNeste:

- AJ testified that the only persons she shared her feelings about VanNeste with were her mother and her counselor and that she did not she share any of these feelings with SJ. (*See id.* at Pg. ID 996);

- AJ admitted that she mentioned to SJ that she wanted their mother and father to get back together, "but that's about it." (*Id.* at Pg. ID 1006.);

- AJ testified that she was not aware of SJ doing anything to split her mother and VanNeste apart. (*See id.* at Pg. ID 1007); and

- AJ testified that she was unaware that SJ was going to make any false allegations against VanNeste. AJ never heard SJ refer to VanNeste as a rapist, and AJ was unaware of SJ ever claiming to have been raped. (*See id.* at Pg. ID 1008-09.)

Finally, AJ admitted that she had learned about condoms, ejaculation, and rape kits in ninth grade health class. (*See id.* at 1020-21, 1039.) She also admitted that she did not initially mention VanNeste using a gun during the assault in a written statement, but she inserted that fact later. (*See id.* at Pg. ID 1062-63.)

**B**

The Court first addresses VanNeste's claim that the state trial court denied him his constitutional right to present a complete defense when, following an *in camera* review prior to his first trial, the court did not turn over to the defense the Child Protective Services Report that included evidence that AJ's sister, SJ, had

threatened to falsely accuse VanNeste of rape. The Michigan Court of Appeals reviewed this claim on direct appeal and rejected it:

> Defendant first argues that the trial court abused its discretion by failing to disclose the report containing SJ's threat at the time it first reviewed the records, and that the trial court's failure to do so prevented defendant from fully investigating the issue. However, when defendant first asked the trial court to review the records, he mentioned two general topics for which he was seeking information: alleged reports of sexual abuse made to CPS that were found to be unsubstantiated, and information from AJ's psychiatric records regarding her apparent hatred for defendant. Defendant made no mention of any threats by SJ to make false allegations; nor did he reveal any intention to pursue a theory that AJ and SJ conspired to falsify sexual-abuse allegations against him. Clearly, defense counsel himself was only made aware of SJ's threats the day before his request. The trial court did not abuse its discretion by failing to disclose information at a time when defendant made no indication that he considered the information relevant.

*VanNeste*, 2015 WL 447453, at *4.

VanNeste has not shown that the Michigan Court of Appeals' ruling was contrary to, or an unreasonable application of, clearly established federal law. First, much of VanNeste's argument addresses perceived errors by the state *trial* court; he does not make any substantial effort to demonstrate error in the Michigan Court of Appeals' reasoning and analysis set forth above. This Court reviews the state appellate court's decision because it is the last reasoned decision on the merits, *see, e.g.*, *Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014) (explaining that federal

15

courts "review the decision of the last state court to issue a reasoned opinion on the issues raised in a habeas petition") (internal punctuation omitted), and VanNeste's failure to show how *that court* erred precludes habeas relief.

Second, VanNeste complains that the Michigan Court of Appeals "refuse[d] or fail[ed] to follow Michigan law" (*id.* at Pg. ID 40), but he is not entitled to habeas relief on that basis because "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

Third, VanNeste argues that the Court of Appeals "turn[ed] a blind eye" to his "constitutional right to present a defense," (Pet., ECF #1 at Pg. ID 36-37), but he has failed to identify an error of sufficient magnitude to warrant habeas relief. VanNeste argues that the Court of Appeals unreasonably applied, or acted contrary to, two decisions of the United States Supreme Court concerning a defendant's right to present a defense. (See Pet., ECF #1 at Pg. ID 37-38, citing *Washington v. Texas*, 388 U.S. 14 (1920) and *Crane v. Kentucky*, 476 U.S. 683 (1986).) But VanNeste has not persuaded the Court that the circumstances of his case are anything like those in the Supreme Court decisions that he cites.

Finally, VanNeste relies upon the decision of the United States Court of Appeals for the Tenth Circuit in *United States v. Robinson*, 583 F.3d 1265 (10th Cir. 2009). But decisions from the United States Courts of Appeals cannot form the basis of clearly established federal law; such law can only come from the United States

Supreme Court. *See* 28 U.S.C. § 2254(d)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*") (emphasis added).

For all of these reasons, VanNeste has failed to show that he is entitled to federal habeas relief on this ground.

## C

VanNeste next argues that the state trial court denied him his constitutional right to present a defense when it held that he "was not entitled to discovery of any mental health reports" related to AJ. (*See id.* at Pg. ID 36-37.) The Michigan Court of Appeals considered this claim on direct appeal and rejected it:

> Defendant's second argument is that the trial court erred by failing to disclose information regarding AJ's alleged extreme mental illness. In the trial court, defendant suggested two areas in which AJ's mental illness could be relevant: (1) as an explanation for her hatred for defendant, and (2) because her mental illness could affect her ability to tell the truth. However, regarding the first area, defense counsel only explained that he believed that AJ had an irrational hatred for defendant which would be "discussed in [her] psychological records." Regarding the second area, defense counsel explained that he felt AJ suffered from an unidentified "extreme mental illness" that "could

affect things like the ability to tell the truth and things of that nature." Clearly, defendant was merely on a fishing expedition, hoping to find that his beliefs might be substantiated by the privileged information he sought to discover. In such a case, he was not entitled to discovery.

Further, we have searched the records provided by the trial court. The information defendant hoped to find does not exist in the records. Accordingly, the trial court did not abuse its discretion by refusing to allow defendant access to AJ's psychiatric records. See MCR 6.201(C)(2)(b)(the trial court need only disclose records if it is satisfied "that the records reveal evidence necessary to the defense").

*VanNeste*, 2015 WL 447453, at *4.

VanNeste has failed to show that the Michigan Court of Appeals' ruling was contrary to, or an unreasonable application of, clearly established federal law. AJ's mental health records were privileged, and VanNeste has failed to show that he could have overcome that privilege. Nor has VanNeste sufficiently explained how he would have used those records to either impeach AJ or exculpate himself. Simply put, VanNeste has not shown that the Michigan Court of Appeals' conclusion that he was on a "fishing expedition" was unreasonable. Finally, both the trial court and the state appellate court reviewed the records and concluded that the "information [VanNeste] hoped to find does not exist." *Id.* For all of these reasons, VanNeste is not entitled to federal habeas relief on this ground.

# D

VanNeste next argues that the state trial court violated his constitutional right to present a defense when it refused to allow him to introduce SJ's threat to falsely accuse him of rape into evidence. He also maintains that the trial court wrongly prohibited him from fully cross-examining AJ about discussions that she had with SJ regarding VanNeste and regarding potentially falsely accusing VanNeste of sexual assault. The Michigan Court of Appeals considered these claims on direct review and rejected them:

> Defendant next argues that the trial court abused its discretion by refusing to allow him to introduce evidence of SJ's threat to make false sexual-assault allegations against him. We disagree. [….]

> The issue raised by defendant is not, as he attempts to frame it, one of constitutional magnitude. Defendant asserts that the trial court's decision that evidence of SJ's threat was inadmissible denied him his constitutional rights to present a defense and to confront the witnesses against him. The trial court's ruling that defendant could not present evidence of SJ's statement during her CPS interview was an evidentiary ruling, premised on MRE 403. "Evidentiary errors are nonconstitutional." *People v. Blackmon*, 280 Mich.App 253, 259; 761 NW2d 172 (2008). Further, the constitutional right to present a defense is "not unlimited and is subject to reasonable restrictions." *People v. King*, 297 Mich.App 465, 473; 824 NW2d 258 (2012). Likewise, defendant's right to cross-examination is not absolute, and remains subject to "legitimate interests of the trial process or of society." *People v. Adamski* 198 Mich.App 133, 138; 497 NW2d 546 (1993). "[N]either the Confrontation Clause nor due process confers an unlimited right to admit all relevant

evidence or cross-examine on any subject." *Id*. Defendant was required to comply with the rules of evidence, and these rules did not infringe upon his constitutional rights unless the rules were arbitrary or disproportionate to the purposes the rules are designed to serve. *King*, 297 Mich.App at 474. Defendant makes no argument that the evidentiary rule at issue, MRE 403, is arbitrary or disproportionate. Accordingly, he has abandoned his claims of constitutional error. *See King*, 297 Mich.App at 474.

Even if we were to consider defendant's argument as raising constitutional issues, we would find defendant's claim without merit. A defendant's right to present a defense is not violated if the defendant is able to present his theory despite the exclusion of evidence. *See People v. Herndon*, 246 Mich.App 371, 411; 633 NW2d 376 (2001). Generally speaking, defendant's theory was that AJ fabricated her allegations. Defendant hoped to demonstrate this theory by presenting evidence that AJ and SJ conspired to fabricate allegations against him. Defense counsel was permitted by the trial court to question AJ regarding whether she was aware of SJ having done anything aimed at splitting defendant and her mother apart, whether she knew of any conversations with SJ regarding false allegations of sexual assault, and whether she or SJ had ever referred to defendant as a rapist. Counsel was also allowed to question AJ at length regarding her hatred of defendant and whether this caused her to try to split her mother and defendant apart. The trial court permitted defendant to pursue his theory, and accordingly, did not deny him the right to present his defense. *Id.* Regarding his right to cross-examination, a careful reading of the transcript reveals that the trial court did not, as defendant alleges, sustain the prosecutor's objection to defendant's question to AJ or strike the question from the record. After the prosecutor's objection, the trial court stated only that AJ had already answered the question. When the prosecutor asked that the response be stricken "for the record," the trial court acknowledged that

the prosecutor had made the request, but did not strike the testimony.

Rather, the issue is whether the trial court abused its discretion by refusing to allow defendant to introduce SJ's statements, contained in the CPS report, threatening to make false sexual-assault allegations against defendant. The trial court's decision to prohibit defendant from introducing this evidence was not an abuse of discretion. Pursuant to MRE 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Under this rule, "'[e]vidence is not inadmissible simply because it is prejudicial.' " *People v. Blackston*, 481 Mich. 451, 482; 751 NW2d 408 (2008), quoting *Waknin v. Chamberlain*, 467 Mich. 329, 334; 653 NW2d 176 (2002). Nor does MRE 403 permit exclusion of evidence simply because the evidence might harm one party's case. *Blackston*, 481 Mich. at 482. "'[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403…'" *Id.* at 483, quoting *Waknin*, 467 Mich. at 334. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v. Crawford*, 458 Mich. 376, 398; 582 NW2d 785 (1998). *See also People v. Mills*, 450 Mich. 61, 75–76; 537 NW2d 909 (1995), mod 450 Mich. 1212 (1995). "The trial court is in the best position to gauge the effect of such [evidence]." *People v. Ackerman*, 257 Mich.App 434, 442; 669 NW2d 818 (2003). "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id.*

SJ's threat had minimal, if any, relevance to the case, and could have been given undue weight by the jury. The threat was not made by AJ. There was no evidence that AJ was aware of the threat. There was also no evidence that AJ and SJ conspired or acted together to frame defendant.

The threat was made more than two years before the incident at issue in this case. The threat was also made by a child, approximately 11 years old, who was clearly upset with her mother, defendant, and other family members at the time. And the evidence was only of a threat, not of an actual plan or effort to put the threat into action by SJ, much less by AJ. On the whole, the trial court did not abuse its discretion by refusing to admit the evidence. While the question was perhaps a close one, the trial court was in the best position to judge the effect of this evidence, and its decision on a close evidentiary question cannot be considered an abuse of discretion. *Id.*

Even if the trial court had erred by excluding the evidence, such error would be harmless. As discussed, SJ's threat was of marginal probative value. Further, it was made known to the jury that AJ had a potential motive to falsify her allegations. AJ herself testified that she hated defendant. She testified that she made it known to many people that she hated defendant, including family members and school counselors. She admitted to writing her hatred of defendant on the walls of his home. She testified that she talked about wanting defendant to die. She admitted to drawing pictures of him burning. She testified that she hated defendant because he was dating her mother, and that she wanted her mother to be with AJ's biological father. Defendant was also given the opportunity to question AJ regarding whether she was aware of SJ's threats, whether she or SJ had referred to defendant as a rapist, or if she had ever known SJ to claim she had been raped. Through his own testimony, defendant suggested that the allegations of sexual abuse were based on AJ's viewing of a movie in which a similarly situated child fabricated evidence to frame her mother's boyfriend for sexual assault. Defendant's brother also testified that AJ had told him defendant would be in jail a few weeks before the incident. Thus, the jury was well aware of defendant's theory that AJ concocted her allegations and evidence in an effort to remove defendant from her life. Evidence of SJ's threat, particularly considering that there

was no evidence of a plan or conspiracy between AJ and SJ, would have added very little support to defendant's theory.

The prosecutor also presented a very strong case against defendant. AJ provided a detailed account of the assault. The prosecutor provided evidence corroborating AJ's testimony that defendant attempted to cover up his act by washing the bed linens. AJ testified that defendant stated he was scared to go to jail during the drive to her grandfather's home. The prosecutor also presented evidence that defendant acted strangely after dropping AJ off with her grandfather, and that he made incriminating statements to police after his arrest. The nurse who examined AJ testified concerning AJ's physical injuries, which were consistent with AJ's version of events and with the occurrence of a sexual assault. Semen was found on vaginal swabs taken from AJ. One form of DNA analysis failed to positively identify defendant as the source of the semen, but all the available data were consistent with defendant's individual DNA profile. A second form of DNA analysis established that the source of the semen was either defendant or one of his male relatives. Further evidence of defendant's guilt came from his own testimony. Defendant attempted to explain how this DNA could have been found on AJ's vaginal swabs by testifying that he saw a male relative fleeing his home when he arrived to pick up AJ. Sebring testified that defendant never made such a claim in his interview, and the prosecutor presented a rebuttal witness who testified that the male relative identified by defendant was being held in a juvenile detention center at the time of the incident. In view of this record evidence, any potential error was harmless.

*VanNeste*, 2015 WL 447453, at ** 5-7.

VanNeste has failed to show that the Michigan Court of Appeals' ruling was contrary to, or an unreasonable application of, clearly established federal law.  First,

to the extent VanNeste argues that the state trial court violated Michigan law when it made certain evidentiary rulings at trial, that claim of state-law error is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 68.

Second, VanNeste has failed to show that the Michigan Court of Appeals ran afoul of any Supreme Court decisions concerning the scope of cross-examination under the Sixth Amendment. In support of this claim, VanNeste cites the Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308 (1974). (*See* Pet., ECF #1 at Pg. ID 45-46.) In *Davis*, the Supreme Court held, on direct review, that a state trial court denied a criminal defendant his constitutional right to confront witnesses when the trial court refused to allow the defendant to cross-examine an important prosecution witness about "the witness' probationary status as juvenile delinquent." *Davis*, 415 U.S. at 309. VanNeste's argument that the Michigan Court of Appeals disregarded *Davis* is as follows:

> The Michigan Court of Appeals' ruling is contrary to the Supreme Court's recognition in *Davis v. Alaska*, 415 U.S. 308 (1974) that the Constitution requires the accused to be able to "fully present his or her theory. *See also*, *Douglas v. Alabama*, 380 U.S. 415, 419 (1965).
>
> Moreover, the Michigan Court of Appeals ignored the evidence and complainant's testimony that she and her sister would talk about their mother not being with Petitioner when they were mad at him, and both had written on the house walls that they hated him. (TIII 629-630) At a minimum, they shared an interest in not wanting their mother to be with Petitioner. Given the limitation of

the cross-examination here of the complainant regarding her sister's threat of a false sexual assault, "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Davis v. Alaska*, *supra* at 318. Simply put, Petitioner was denied the right of effective cross-examination. This is constitutional error of "the first magnitude." *Davis v. Alaska*, *supra* at 318. See also, *Smith v. Illinois*, 390 U.S. 129 (1968).

(Pet., ECF #1 at Pg. ID 45-46.)

The Court is not persuaded that the Michigan Court of Appeals unreasonably applied, or acted contrary to, *Davis*. The record contains evidence that supports the Court of Appeals' conclusion that VanNeste did have a sufficient opportunity for cross-examination. For instance, as set forth in detail in Section III(A)(2) above, VanNeste was able to, and did, present evidence at trial that AJ intensely hated him and that she had talked and written about killing him. VanNeste was also able to elicit testimony from AJ that she wanted her biological father and her mother to get back together. In addition, the trial court permitted VanNeste to ask AJ about whether she was aware of SJ having done anything that was intended to split her mother and VanNeste apart, whether she was aware of any conversations with SJ regarding false allegations of sexual assault, and whether she or SJ had ever referred to VanNeste as a rapist. Based on his ability to present all of this evidence, the Michigan Court of Appeals did not unreasonably conclude that VanNeste was able to conduct a sufficient cross examination of AJ in support of his defense theory.

VanNeste counters that he is entitled to relief on this ground based upon the United States Court of Appeals for the Sixth Circuit's decision in *Brown v. Smith,* 551 F.3d 424 (6th Cir. 2008). In *Brown*, the Sixth Circuit held that a habeas petitioner was denied the effective assistance of counsel. Among other things, the petitioner's counsel failed to sufficiently investigate whether certain counselling records may have provided evidence that could have been used to impeach the victim's credibility and testimony that the petitioner had sexually abused her. VanNeste argues that *Brown* "rejected the notion that a little cross-examination is constitutionally sufficient" to attack a witnesses' credibility and that a defendant must "be able to fully present his or her theory" at trial. (Pet., ECF #1 at Pg. ID 44-45.)

But *Brown* is distinguishable from VanNeste's case. First, *Brown* involved a claim of ineffective assistance of counsel, not a claim involving a right to present a defense. Thus, the lens through which the Sixth Circuit analyzed the claims in *Brown* is different from the analysis the Court must conduct here. Second, the Sixth Circuit applied the less deferential *de novo* standard of review to Brown's ineffective assistance claim, and not AEDPA's more deferential standard of review, because there had not been an adjudication of the claim in the state courts. Here, however, as VanNeste acknowledges (*see* Pet., ECF #1 at Pg. ID 26-29), AEDPA's more deferential standard of review applies because the Michigan Court of Appeals

26

adjudicated the merits of VanNeste's claims.  Third, in *Brown*, the only evidence of

guilt was the uncorroborated testimony of the complaining witness.  Thus, the

credibility of that witness was paramount.  In this case, in contrast, the evidence was

not limited to AJ's claim of abuse alone, and the prosecution introduced substantial

corroborating evidence, including DNA evidence.  *Brown* simply does not compel

the Court to conclude that VanNeste is entitled to federal habeas relief.

In sum, VanNeste's counsel broadly cross-examined AJ at trial, bringing

before the jury her intense hatred of VanNeste.  And VanNeste's counsel questioned

AJ about her knowledge of SJ's allegations. Under these circumstances, VanNeste

has not shown that the Michigan Court of Appeals' conclusion that he was afforded

a meaningful opportunity to present his defense was unreasonable. VanNeste is

therefore not entitled to federal habeas relief on this ground.

## E

Finally, VanNeste claims that the state trial court denied him his constitutional

right to present a full defense when the trial court struck certain testimony VanNeste

offered in his own defense related to VanNeste's contacts with Child Protective

Services.  The Michigan Court of Appeals rejected this claim on direct appeal and

found the constitutional claim abandoned:

> Defendant also alleges error arising from the following
> colloquy, which occurred when defendant testified on his
> own behalf:

Q. Were you ever aware of, well, let me rephrase that. Were things done around the house specifically to try to get at you, any of the kids to try specifically to get at you or make you look in a bad light? Anything that was—

A. When the place, when C.P.S. was there every other week at least, once a week claiming I've done something. And C.P.S. came out on each and every one.

The Prosecutor: Your Honor, I am going to object. We had a ruling on this, and I would ask that it be stricken.

The Court: I believe [the] objection is sustained, and the remark is stricken.

Defendant argues that the trial court "erred in extending [its] prior ruling to [d]efendant's testimony, and should have given [d]efendant an opportunity to explain his personal contacts with [CPS], at least with respect to claims by the complainant." As the only ruling disputed by defendant is the ruling excluding SJ's statement contained within the CPS report, we presume that this is the ruling defendant believes was utilized to sustain the prosecutor's objection. In this regard, defendant's premise is dubious, as there is nothing in the record that makes it clear what earlier ruling the trial court relied on in striking defendant's remark, and neither the question posed nor the answer provided suggested a reference to SJ's threat.

Defendant asserts that, but for the trial court's ruling, he could have demonstrated a pattern of false claims by AJ, and states that such testimony was essential to his "constitutional right to testify and right to present favorable testimony." Defendant cites no legal authority regarding these rights, and offers no analysis of how these rights were violated. To the extent defendant contends the trial court's ruling violated his constitutional rights, he has

> abandoned the issue. " 'It is not enough for an appellant in
> his brief simply to announce a position or assert an error
> and then leave it up to this Court to discover and
> rationalize the basis for his claims, or unravel and
> elaborate for him his arguments, and then search for
> authority either to sustain or reject his position. The
> appellant himself must first adequately prime the pump;
> only then does the appellate well begin to flow.'" *People
> v. Waclawski*, 286 Mich.App 634, 679; 780 NW2d 321
> (2009), quoting *Mitcham v. Detroit*, 355 Mich. 182, 203;
> 94 NW2d 388 (1959). Defendant's failure to brief the
> merits of his issue constitutes abandonment of the issue on
> appeal. *King*, 297 Mich.App at 474.

*VanNeste*, 2015 WL 447453, at *8.

To the extent VanNeste seeks federal habeas relief on the ground that the state

trial court's ruling denied him his constitutional right to present a defense, the Court

reviews that claim *de novo* because the Michigan Court of Appeals did not address

the merits of the claim and found it abandoned. *See McKenzie v. Smith*, 326 F.3d

721, 727 (6th Cir. 2003). But even under this less deferential standard of review,

the Court still concludes that VanNeste is not entitled to federal habeas relief.

VanNeste simply has not shown how this one colloquy with the trial court violated

his constitutional right to present a defense. VanNeste acknowledges that "the

record could be more clear" with respect to the trial court's ruling (Pet., ECF #1 at

Pg. ID 47), and he has not provided this Court a sufficient basis to fully understand

the scope of that ruling. It is not at all clear what previous "ruling" the trial court

was referring to when it sustained the prosecution's objection, nor is it apparent how

that the ruling prevented VanNeste from presenting evidence related to his defense that AJ fabricated her allegations against him. Indeed, as described above, VanNeste was able to present evidence to the jury that AJ hated him, wished he were dead, and wanted to split up the relationship between VanNeste and her mother. VanNeste is not entitled to federal habeas relief on this ground.

As VanNeste has failed to demonstrate entitlement to federal habeas relief with respect to any of his claims, the Court will **DENY** his habeas petition (ECF #1).

## IV

In order to appeal the Court's decision, VanNeste must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *See Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, jurists of reason would not debate the Court's conclusion that VanNeste has failed to demonstrate entitlement to habeas relief with respect to any of his

claims because they are all devoid of merit. Therefore, the Court will not issue him a certificate of appealability.

<h1 style="text-align:center">V</h1>

Accordingly, for the reasons stated above, the Court 1) **DENIES WITH PREJUDICE** VanNeste's petition for a writ of habeas corpus (ECF #1) and 2) **DECLINES** to issue VanNeste a certificate of appealability.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: October 4, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 4, 2018, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764